**BRODSKY & SMITH, LLC**
Evan J. Smith, Esquire
9595 Wilshire Boulevard, Suite 900
Beverly Hills, CA 90212
Phone: (877) 534-2590
Facsimile: (310) 247-0160
esmith@brodskysmith.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRICIA MAYER, Individually and On Behalf of All Others Similarly Situated, | Case No.: |
| Plaintiff, | **CLASS ACTION COMPLAINT FOR:** |
| v. | (1)   Violation of § 14(e) of the Securities Exchange Act of 1934 |
| GUIDANCE SOFTWARE, INC., ROBERT VAN SCHOONENBERG, REYNOLDS C. BISH, MAX CARNECCHIA, JOHN COLBERT, PATRICK DENNIS, MICHAEL MCCONNELL, WADE W. LOO, OPEN TEXT CORPORATION, and GALILEO ACQUISITION SUB INC., | (2)   Violation of § 20(a) of the Securities Exchange Act of 1934 |
| | (3)   Breach of Fiduciary Duties |
| Defendants. | **JURY DEMAND** |

Plaintiff Patricia Mayer ("Plaintiff"), by her attorneys, on behalf of herself and those similarly situated, files this action against the defendants, and alleges upon information and belief, except for those allegations that pertain to her, which are alleged upon personal knowledge, as follows:

### SUMMARY OF THE ACTION

1.      Plaintiff brings this stockholder class action on behalf of herself and all other public stockholders of Guidance Software, Inc. ("Guidance" or the "Company"), against Guidance, Open Text Corporation ("Parent"), Parent's wholly-owned subsidiary, Galileo Acquisition Sub Inc. ("Merger Sub," and together with Parent, "Open Text"), and the Company's Board of Directors (the "Board" or the "Individual Defendants," and collectively with Guidance and Open Text, the "Defendants") for violations of Sections 14(d)(4), 14(e) and 20(a) of the Securities and Exchange

Act of 1934 (the "Exchange Act"), and for breaches of fiduciary duty as a result of Defendants' efforts to sell the Company as a result of an unfair process, and for an unfair price. This action seeks to enjoin a tender offer currently scheduled to expire on September 6, 2017 (the "Tender Offer" or "Offer"), upon the successful completion of which Open Text shall acquire each outstanding share of Guidance common stock for $7.10 per share in cash (the "Proposed Transaction" or "Merger").

2.    The terms of the Proposed Transaction were memorialized in a July 25, 2017 filing with the Securities and Exchange Commission ("SEC") on Form 8-K attaching the definitive Agreement and Plan of Merger (the "Merger Agreement"). Notably, the terms of the Merger Agreement require that stockholders tender only one share more than 50% of the sum of the total number of shares of Guidance stock then outstanding at the time of the expiration of the Offer (the "Minimum Condition"). The failure of the Merger Agreement to provide for a "majority of the minority provision" is made more significant by the fact that according to the Company's most recent Proxy Statement filed on Schedule 14A, the senior executive officers of the Company, together with the Individual Defendants, collectively own approximately 8.4% of all outstanding shares of Guidance stock, institutional investors RGM Capital and PRIMECAP Management Co. own 10.3% and 14.3%, respectively, and Company founder Shawn and Jennifer McCreight own approximately 26% of all outstanding Guidance stock. As such, consummation of the Merger is a *fait accompli*.[1]

3.    On August 8, 2017, Guidance filed a Solicitation/Recommendation Statement on Schedule 14D-9 (the "14D-9" or "Recommendation Statement") with the SEC in support of the Proposed Transaction. In violation of Sections 14(d), 14(e) and 20(a) of the Exchange Act and their fiduciary duties, Defendants caused to be filed the materially deficient 14D-9 in an effort to

---

[1] In connection with the Offer and Merger, all members of the Board of Directors of the Company and certain officers of the Company have entered into a Tender and Voting Agreement (the "Tender Agreement") agreeing to, among other things, tender all the shares beneficially owned by them pursuant to the Offer and to vote against any Competing Proposal (as defined in the Merger Agreement) or any merger, consolidation or other combination involving the Company, other than the Merger, unless the Merger Agreement is terminated..

1  solicit stockholders to tender their Guidance shares in favor of the Proposed Transaction. The

2  14D-9 is materially deficient and deprives Guidance stockholders of information they need to

3  make an intelligent, informed and rational decision of whether to tender their shares in favor of

4  the Proposed Transaction. As detailed below, the 14D-9 omits and/or misrepresents material

5  information concerning, among other things: (a) the Company's financial projections; (b) the sales

6  process of the Company; and (b) the data and inputs underlying the financial valuation analyses

7  that purport to support the fairness opinions provided by the Company's financial advisor Morgan

8  Stanley & Co., LLC ("Morgan Stanley"); and (c) the financial analyses performed by Morgan

9  Stanley in support of the Proposed Transaction.

10      4.      Absent judicial intervention, the Merger will be consummated, resulting in

11  irreparable injury to Plaintiff and the Class. This action seeks to enjoin the Proposed Transaction

12  or, in the event the Proposed Transaction is consummated, to recover damages resulting from

13  violation of the federal securities laws by Defendants.

14                                          **PARTIES**

15      5.      Plaintiff is an individual citizen of the State of Arizona. She is, and at all times

16  relevant hereto, has been a Guidance stockholder.

17      6.      Defendant Guidance is a Delaware corporation and maintains its principal

18  executive offices at 1055 E. Colorado Blvd., Pasadena, CA 91106. Guidance's common stock is

19  traded on the NasdaqGM under the ticker symbol "GUID."

20      7.      Defendant Robert van Schoonenberg ("van Schoonenberg") has been a director

21  at all relevant times and is Chairman of the Board.

22      8.      Defendant Reynolds C. Bish ("Bish") has been a director at all relevant times.

23      9.      Defendant John Colbert ("Colbert") has been a director at all relevant times,

24  and served as Chief Executive Officer ("CEO") of Guidance from 2004 to 2008.

25      10.     Defendant Max Carnecchia ("Carnecchia") has been a director at all relevant times.

26      11.     Defendant Patrick Dennis ("Dennis") has been a director at all relevant times.

27      12.     Defendant  Michael McConnell ("McConnell") has been a director at all relevant

28  times.

13.     Defendant  Wade W. Loo ("Loo") has been a director at all relevant times.

14.     The defendants identified in paragraphs 7 through 13 are collectively referred to herein as the "Director Defendants" or the "Individual Defendants."

15.     Defendant Parent is a corporation incorporated under the federal laws of Canada and is a party to the Merger Agreement.

16.     Defendant Merger Sub is a Delaware corporation, a wholly-owned subsidiary of Parent, and a party to the Merger Agreement.

### JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(e), 14(d), and 20(a) of the Exchange Act.  This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have.  The Court has supplemental jurisdiction over any claims arising under state law pursuant to 28 U.S.C. § 1367.

18.     Personal jurisdiction exists over each defendant either because the defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over defendant by this Court permissible under traditional notions of fair play and substantial justice.

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391, because Guidance has its principal offices in this District, and each of the Individual Defendants, as Company officers or directors, has extensive contacts within this District.

### CLASS ACTION ALLEGATIONS

20.     Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23, individually and on behalf of the stockholders of Guidance's common stock who are being and will be harmed by Defendants' actions described herein (the "Class").  The Class specifically

excludes Defendants herein, and any person, firm, trust, corporation or other entity related to, or affiliated with, any of the Defendants.

21.    This action is properly maintainable as a class action because:

(a)    The Class is so numerous that joinder of all members is impracticable. According to the Company's SEC filings, as of August 3, 2017, there were 33,431,155 shares of Guidance shares outstanding.  The actual number of public stockholders of Guidance will be ascertained through discovery;

(b)    There are questions of law and fact which are common to the Class, including *inter alia*, the following:

(i)    Whether Defendants have violated the federal securities laws;

(ii)    Whether Defendants made material misrepresentations and/or omitted material facts in the 14D-9;

(iii)    Whether Defendants have breached their fiduciary duties; and

(iv)    Whether Plaintiff and the other members of the Class have and will continue to suffer irreparable injury if the Proposed Transaction is consummated.

(c)    Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class;

(d)    Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

(e)    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class;

(f)    Plaintiff anticipates that there will be no difficulty in the management of this litigation and, thus, a class action is superior to other available methods for the fair and efficient adjudication of this controversy; and

CLASS ACTION COMPLAINT

(g)    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

22.    By reason of the Individual Defendants' positions with the Company as officers and/or directors, said individuals are in a fiduciary relationship with Guidance and owe the Company the duties of due care, loyalty, and good faith.

23.    By virtue of their positions as directors and/or officers of Guidance, the Individual Defendants, at all relevant times, had the power to control and influence, and did control and influence and cause Guidance to engage in the practices complained of herein.

24.    Each of the Individual Defendants are required to act with due care, loyalty, good faith and in the best interests of the Company.  To diligently comply with these duties, directors of a corporation must:

(a)    act with the requisite diligence and due care that is reasonable under the circumstances;

(b)    act in the best interest of the company;

(c)    use reasonable means to obtain material information relating to a given action or decision;

(d)    refrain from acts involving conflicts of interest between the fulfillment of their roles in the company and the fulfillment of any other roles or their personal affairs;

(e)    avoid competing against the company or exploiting any business opportunities of the company for their own benefit, or the benefit of others; and

(f)    disclose to the Company all information and documents relating to the company's affairs that they received by virtue of their positions in the company.

25.    In accordance with their duties of loyalty and good faith, the Individual Defendants, as directors and/or officers of Guidance, are obligated to refrain from:

(a)    participating in any transaction where the directors' or officers' loyalties are divided;

(b)    participating in any transaction where the directors or officers are entitled to receive personal financial benefit not equally shared by the Company or its public stockholders; and/or

(c)    unjustly enriching themselves at the expense or to the detriment of the Company or its stockholders.

26.    Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, violated, and are violating, the fiduciary duties they owe to Guidance, Plaintiff and the other public stockholders of Guidance, including their duties of loyalty, good faith, and due care.

27.    As a result of the Individual Defendants' divided loyalties, Plaintiff and Class members will not receive adequate, fair or maximum value for their Guidance common stock in the Proposed Transaction.

## SUBSTANTIVE ALLEGATIONS

### Company Background

28.    Guidance is a technology company that is a provider of endpoint investigation solutions for cybersecurity analytics, security incident response, e-discovery, data privacy and forensic analysis.  The Company has five segments, which include Products, Subscription, Professional services, Training and Maintenance.  The Company's EnCase platform provides an investigative infrastructure that enables its customers to search, collect, and analyze electronically stored information in order to address human resources matters, litigation matters, allegations of fraud, suspicious network endpoint activity, and to defend and secure their organization's data assets. Guidance's solutions are used by a wide array of institutions and are deployed on an estimated 35 million endpoints at more than 70 of the Fortune 100 companies and hundreds of agencies worldwide, from beginning to endpoint.

29.    The Company's main products and services are its forensic security suite of products, including: EnCase Endpoint Security, which provides IT cybersecurity functionality to enterprises and government agencies through its incident response and sensitive data discovery capabilities; EnCase Endpoint Investigator, which provides an investigative platform that enables

an organization to search, collect, preserve, and analyze data on the servers, desktops, and laptops across its network; and EnForce Risk Manager, which allows organizations to implement a proactive approach to information governance, ensuring that sensitive data is identified, classified, and remediated.

30.    Popular Guidance product offerings, in addition to its forensic security products, include: EnCase Forensic, which is a forensic investigation solution that enables forensic practitioners to conduct efficient, forensically sound digital data collection and investigations; EnCase eDiscovery, which is an e-discovery solution addressing the end-to-end e-discovery needs of corporations and government agencies; EnCase eDiscovery Review, which is a cloud- hosted, multi-matter review platform; and Forensic appliances, which includes write blockers, forensic duplicators, and storage devices.

31.    In addition, Guidance complements these offerings with a comprehensive array of professional, subscription, and training services, including technical support and maintenance services to help its customers implement the Company's solutions, conduct investigations, and train their IT and legal professionals to effectively and efficiently use Guidance's products.

***The Flawed Sales Process***

32.    In August 2015, Guidance reviewed the progress of its CaseCentral business (the "CaseCentral Business") which it acquired in February 2012. The CaseCentral Business had not been performing as expected. Due to the lower performance the Company met with Piper Jaffray & Co ("Piper Jaffray") to discuss alternatives for the CaseCentral Business, and on September 8, 2015, Piper Jaffray and the Company entered into an engagement letter for the purposes of pursuing potential strategic alternatives relating to the CaseCentral Business.

33.    From September 2015 through January 2016, 15 potentially interested parties were contacted by Piper Jaffray, including Open Text. The Company executed confidentiality agreements with eight of these parties. The Company received proposals for an acquisition of the CaseCentral Business from two of the parties contacted, Party A and Party B.

34.    On January 6, 2016, Party B submitted a non-binding term sheet to acquire the CaseCentral Business as well as Guidance's eDiscovery business, for up to $10 million.

CLASS ACTION COMPLAINT

35.     On January 13, 2016, Shawn McCreight ("McCreight"), the Company's Chief Technology Officer ("CTO"), founder, and trustee of the Company's largest stockholder, The McCreight Living trust, terminated his relationship as an employee of the Company.  On January 15, 2016, the Board replaced McCreight as Chairman of the Board and formed a committee comprised of independent directors (the "Independent Committee").

36.     On February 9, 2016, the Board met with outside counsel ("Latham & Watkins") and decided to form an M&A committee (the "M&A Committee") which was designed to evaluate potential strategic partnerships and transactions.  The M&A Committee was comprised of Defendant Dennis, Christopher Poole (a former board member), and Defendant Carnecchia.

37.     On February 10, 2016, McCreight submitted a stockholder nomination letter aiming to replace all members of the Board.   The following day, McCreight informed Guidance of his intention to nominate five directors at Guidance's 2016 annual meeting.

38.     On February 16, 2016, Party C submitted a non-binding letter of intent and term sheet to acquire the CaseCentral Business for $14 million.  The letter included an exclusivity period of 30 days to enable Party C to pursue negotiations concerning a definitive purchase agreement.

39.     On February 22, 2016, Party C submitted a revised non-binding letter of intent to acquire the CaseCentral Business for $15 million, which also included a 30 day exclusivity period.  The Company agreed to the request for exclusivity at the recommendation of the M&A Committee.

40.     On March 11, 2016, Defendant Dennis and Barry Plaga, Guidance's Chief Financial Officer ("CFO") and Chief Operating Officer ("COO"), met with Party D at the request of a significant stockholder.

41.     On April 4, 2016, the Independent Committee met and determined not to pursue conversations relating to a potential strategic transaction with Party D due to the ongoing proxy contest with McCreight. During this meeting the Independent Committee also discussed conversations with Party C in which Party C indicated it would have to reduce its proposal price

1  due to its determination, after conducting due diligence, that it would have to make significant

2  investments into the CaseCentral Business if the purchase was to be effectuated.

3        42.    On April 9, 2016, Party D sent an unsolicited and non-binding indication of interest

4  to Guidance to acquire the entire company for $6 per share.

5        43.    On April 11, 2016, the M&A Committee met and determined that the Company

6  should seek engagement proposals from financial advisors in connection with Party D's offer, as

7  it was an offer to acquire the entire Company.

8        44.    Between April 18 and April 22, 2016, the M&A Committee held meetings with

9  four potential financial advisors, including Morgan Stanley & Co. LLC ("Morgan Stanley") and

10  Atlas Technology Group, LLC ("Atlas").

11        45.    On April 22, 2016, McCreight and Guidance reached a settlement agreement under

12  which Defendant Colbert and Defendant McConnell replaced McCreight and Poole on the Board,

13  and customary standstill provisions were agreed to by McCreight and his affiliated entities. The

14  M&A Committee was reorganized to include Defendant Bish and Defendant McConnell.

15        46.    On April 26, 2016, the Independent Committee was dissolved by the Board.

16        47.    On May 11, 2016, the M&A Committee met and noted that the attempt to sell the

17  CaseCentral Business did not result in any acceptable offers, considering Party C's indication that

18  it would significantly reduce its offer. The M&A Committee determined that Guidance should

19  instead focus on strengthening the CaseCentral Business. The M&A Committee also determined

20  that Party D's offer was insufficient relative to the Company's intrinsic value, because the

21  Company's public stock price had been deflated due to the proxy contest with McCreight. As

22  such, the M&A Committee recommended that the Board not pursue a transaction with Party D.

23  The M&A Committee also recommended that Atlas be retained by the Company as a non-

24  exclusive financial advisor relating to the review of potential strategic alternatives.

25        48.    On May 17, 2016, Guidance and Atlas entered into an engagement letter under

26  which Atlas would serve as a non-exclusive financial advisor to assist in the review of strategic

27  alternatives.

28

CLASS ACTION COMPLAINT

49.    On July 29, 2016, Party D submitted a revised indication of interest representing an increased offer price of $7 or more per share in cash.

50.    On July 29, 2016, the Board determined that it should consider all strategic alternatives and that if they decided to pursue a sale process they would reach out to Party D to gauge their continued interest.

51.    On August 12, 2016, Defendant Dennis was introduced by a mutual contact to Mark Barrenechea ("Barrenechea"), CEO and CTO of Open Text, and Douglas Parker ("Parker"), Senior Vice President of Corporate Development at Open Text. Barrenechea expressed interest in a potential strategic transaction with Guidance and Defendant Dennis stated he was not in a position to discuss such a transaction but would relay the interest to the Board.

52.    On August 25, 2016, the M&A Committee determined to recommend that the Board retain Morgan Stanley as a second financial advisor, and Defendant Dennis discussed his conversation with Barrenechea with the M&A Committee and other members of the Board who were present.

53.    On August 31, 2016, the Board met and determined to engage with Morgan Stanley for the purposes of a potential sale of Guidance. On the same day, Guidance and Morgan Stanley entered into an engagement agreement.

54.    On October 17, 2016, Morgan Stanley discussed with the Board a list of potential strategic parties who would have the ability to pursue a transaction. This list did not include Party A, because it was believed that Party A would not have the financial capability nor the credibility to pursue such a transaction.

55.    From late October through November 2, 2016, at the direction of the Board, Morgan Stanley reached out to 30 potentially interested parties regarding the sale process.

56.    On October 26, 2016, the M&A Committee met with Morgan Stanley and Defendant Dennis noted his conversation with Open Text and its desire to be involved in the sale process. The M&A Committee also determined and requested two members of the Board contact McCreight to determine whether he would be willing to enter into a confidentiality agreement in the event that a voting agreement would be required considering his substantial stock ownership.

CLASS ACTION COMPLAINT

57.    Between October 28 and November 9, 2016, Open Text and Guidance negotiated a confidentiality agreement, and it was entered into on November 11, 2016.

58.    On November 1, 2016, Morgan Stanley was contacted, on an unsolicited basis, by Party A regarding a potential combination with Guidance under which stockholders would receive cash as well as common stock of Party A. On the same day, Guidance received an indication of interest from Party A which valued Guidance shares at a range from $7.70 to $8.70 per share. This indication of interest also included a request for exclusivity until January 1, 2017.

59.    By November 2, 2016, Morgan Stanley had reached out to 30 potentially interested parties (12 strategic parties and 18 financial sponsors). Of these 30 parties, 13 entered into confidentiality agreements (two strategic parties and 10 financial sponsors) with Guidance. According to the Recommendation Statement, each of the confidentiality agreements included standstill provisions permitting counterparties to make private acquisition proposals to the Board and/or Guidance's CEO.

60.    As of November 22, 2016, Morgan Stanley had reached out to 33 potentially interested parties, 12 of which remained in the process. Morgan Stanley informed potentially interested parties of a December 5, 2016 deadline for delivering preliminary indications of interest.

61.    On November 22, 2016, the Board met and discussed and approved a request from Party D for permission to seek debt financing sources as permitted under the terms of the confidentiality agreement it had entered into with Guidance. In addition, the Board discussed Party A's proposal and determined that the proposal was likely invalid as it inflated the value of Party A's common stock. With this in mind, the Board instructed Morgan Stanley to contact Party A to determine the valuation methods used and the terms of the proposal.

62.    As of December 5, 2016, in addition to the interest from Party A, Morgan Stanley received indications of interest from Party D and Party G. Party D's proposal included a per share price at or above $7 and indicated Party D could proceed on an expedited basis. Party G's proposal included a per share price of $7.10 and also indicated that Party G could proceed on an expedited basis.

63.    On December 6, 2016, at a Board meeting, Morgan Stanley informed the Board of the two indications of interest received and the proposal from Party A, which had not been modified since it was originally submitted on November 1, 2016.  With respect to Party A's proposal, Morgan Stanley also informed the Board that Party A was unable to respond to questions raised regarding clarification as to valuation methods used and the terms of its proposal.  In addition, Morgan Stanley informed the Board that Party A indicated it would not be able to execute a transaction for at least a couple of months.  After discussions with Latham & Watkins, the Board determined to include a "go shop" provision in the draft merger agreement that had been prepared for circulation.

64.    At the same meeting, the Board discussed that certain interested parties might require management to continue with the Company, and that Party D had expressly indicated as such in their indication of interest.  With this in mind, the Board requested that management refrain from discussing compensation agreements with the potentially interested parties until the Board consented to such. Management agreed to comply with this request.

65.    On January 4, 2017, Party D reduced its proposed purchase price from $7.10 to "below $7 per share" due to its belief that additional investments would be required upon closing.

66.    On January 7, 2017, Party A informed Morgan Stanley they would not be able to meet Guidance's timeline for the potential transaction and that it would not provide additional information relating to the proposal it previously submitted.

67.    On January 24, 2017, Guidance received a revised proposal from Party G with a purchase price of $5.60 per share.

68.    On January 25, 2017, the Board met and determined to cease reviewing strategic alternatives and to instead concentrate on Guidance's operations as a stand-alone company.

69.    On February 8, 2017, Morgan Stanley reached out to Open Text to resume communications between it and Guidance.

70.    On February 21, 2017, Morgan Stanley received written notice from Guidance terminating their engagement.

CLASS ACTION COMPLAINT

71.     On March 21, 2017, Open Text and Defendant Dennis held a phone call during which they discussed the sale process that had previously ended as well as the strategic alternatives that were currently being considered by the Board.

72.     On April 20, 2017, Guidance received a non-binding preliminary indication of interest from Open Text with a cash tender offer at $6.79 per share. The indication of interest requested an exclusivity period until May 23, 2017, with an automatic extension to May 30, 2017, contingent on Open Text's good faith pursuit of a transaction.  The Board met and discussed Open Text's indication of interest.  The Board determined that the offer price was inadequate and instructed Morgan Stanley to inform Open Text that Guidance would consider limited exclusivity if Open Text increased its purchase price.  On the same day, Guidance reinstated its engagement letter with Morgan Stanley.

73.     On May 3, 2017, after a request for a counter proposal from Open Text, the Board instructed Morgan Stanley to counter with a proposed purchase price of $7.15 and to send a draft merger agreement to Open Text.

74.     On June 16, 2017, Open Text submitted a revised proposal containing a $7.05 per share offer and a requirement that a "go shop" period would not be included in the merger agreement.

75.     On June 21, 2017, the Board met and determined it would be willing to accept an exclusivity arrangement with Open Text if Open Text increased its proposed purchase price to $7.15. This counteroffer was relayed to Open Text by Morgan Stanley on June 22, 2017.

76.     On June 23, 2017, Open Text sent Guidance a non-binding preliminary indication of interest with a purchase price of $7.10 to be completed via a public tender offer.  The indication also included an exclusivity period set to expire on July 28, 2017 (with a potential seven-day extension).

77.     On June 27, 2017, at Board's direction, Guidance entered into the exclusivity agreement with Open Text that was set to expire on August 1, 2017.

CLASS ACTION COMPLAINT

78.    From June 29, 2017 through July 25, 2017, Open Text conducted due diligence concerning the transaction and various draft merger agreements were exchanged and negotiated between the two parties.

79.    On July 25, 2017, Morgan Stanley submitted its fairness opinion with respect to the transaction and the Board unanimously determined that the Merger and tender agreements contemplated with Open Text were in the best interests of Guidance and Guidance stockholders. As such, the Board determined to recommend Company stockholders tender their shares in support of the Open Text offer.

***The Proposed Transaction***

80.    On July 26, 2017, the Company issued a press release announcing that Guidance had agreed to be acquired by Open Text in the Proposed Transaction.  The press release states in relevant part:

> PASADENA,    Calif.--(BUSINESS    WIRE)--    Guidance    Software (NASDAQ:GUID), the makers of EnCase®, the gold standard in forensic security, today announced that it has entered into a definitive agreement to be acquired by OpenText™ (NASDAQ:OTEX) (TSX:OTEX), the global leader in Enterprise Information Management (EIM).
>
> Under the terms of the merger agreement, OpenText will commence a tender offer to acquire all outstanding shares of Guidance Software common stock in a transaction valued at approximately $240 million. Subject to the terms and conditions of the offer, Guidance stockholders will receive $7.10 per share in cash for each outstanding share of common stock held.
>
> "Our board of directors has carefully evaluated the merger proposal by OpenText and believes it represents the best value reasonably attainable for our stockholders and will benefit our customers and employees," said Patrick Dennis, Guidance president and CEO. "We believe this all-cash transaction offers our stockholders liquidity and certainty of value. Joining with OpenText is a new beginning for Guidance products, customers and employees."
>
> The merger has been unanimously approved by the Board of Directors of Guidance and is expected to close in the third quarter of calendar 2017. Consummation of the transaction is subject to customary closing conditions, including the receipt of regulatory approvals and the tender of a majority of the shares of Guidance Software common stock in the offer.
>
> Morgan Stanley and Atlas Technology Group are serving as financial advisors and Latham & Watkins is acting as legal counsel to Guidance.

- 15 -

*The Inadequate Merger Consideration*

81. Significantly, analyst expectations, the Company's strong market position, extraordinary growth, positive future outlook, and synergistic benefits with Open Text establish the inadequacy of the merger consideration.

82. First, the compensation afforded under the Proposed Transaction to Company stockholders significantly undervalues the Company. The proposed valuation does not adequately reflect the intrinsic value of the Company. Moreover, the valuation does not adequately take into consideration how the Company is performing, considering increases in revenues reported by the Company recent quarters of the past financial year. For example, on February 13, 2017, Guidance reported 2016 Fourth Quarter and Full Year Financial Results. Financial highlights for the fourth quarter of 2016, on a generally accepted accounting principles (GAAP) basis, included:

  A. Revenue of $29.5 million, compared to $27.6 million in the fourth quarter of 2015;

  B. Net loss of $1.6 million, or ($0.06) per share, compared to a net loss of $3.6 million, or ($0.13) per share, in the fourth quarter of 2015; and

  C. EBITDA of ($0.4) million, compared to EBITDA of ($2.0) million in the fourth quarter of 2015.

Financial highlights, on a non-GAAP basis, which excludes share-based compensation, amortization of intangibles, realignment expenses and income taxes, included:

  A. Non-GAAP net income of $2.8 million, or $0.09 per share, in the fourth quarter of 2016, compared to non-GAAP net loss of $1.3 million, or ($0.05) per share, in the fourth quarter of 2015; and

  B. Non-GAAP EBITDA of $3.7 million, compared to non-GAAP EBITDA of ($0.1) million in the fourth quarter of 2015.

83. "We entered 2016 with a plan to: 1) pivot to cybersecurity, 2) transform our go-to-market and product delivery capabilities, and 3) set a foundation for long-term, sustainable growth. I'm very happy to report that we executed on all of these objectives. Additionally, we restructured the business for profitability and exited 2016 in a strong position," said Defendant Dennis,

Guidance Software's president and CEO.  Defendant Dennis added, "As we start 2017, we are positioned for another year of revenue growth and a return to sustained non-GAAP profitability. The ongoing shift in customer spending to rapid detection and response solutions like ours, combined with our 2016 cost structure realignment efforts, puts us in a strong competitive position to drive shareholder value in 2017 and beyond."

84.    In the end-year financial press release, the Company also reaffirmed its guidance for upcoming fiscal 2017.  "In Q4, we completed our restructuring efforts in an effort to support our EBITDA targets in 2017. We no longer have the costs related to the proxy fight and the patent litigation and settlement weighing down cash flow from operations," stated Barry Plaga, Guidance Software's CFO and COO.

85.    The positive momentum achieved by Guidance to end fiscal 2016, has carried over into the current fiscal year.  On May 2, 20167, Guidance reported First Quarter Financial Results which saw revenue increase to $26.8 million, as compared to $25.8 million in Q1 2016, while the Company's net loss of $1.7 million was a significant improvement as compared to the Company's Q1 2016 net loss of $6.8 million.  "The Q1 financial results are a solid start to 2017. These results include growth in product revenue, total revenue, forensic security bookings, and earnings. Not only have we grown in each of these important areas that are crucial to our long-term success, we have strengthened our cash position as planned," said Defendant Dennis.

86.    The Company's Q2 2017 financial results, reported on August 1, 2017, are equally impressive in the key metric of net loss.  In the second quarter of 2017 Guidance reported a net loss of $1.2 million, or ($0.04) per share, compared to a net loss of $9.7 million, or ($0.33) per share, in the second quarter of 2016.  As the Company has shown, it is well on its way to sustained profitability.

87.    Notably, analyst coverage indicates high price targets that are well above the deal price, with analysts at Northland Securities, valuing the Company at $8.00 per share as recently as July 22, 2017, and with analysts from Imperial Capital and Benchmark Co. also setting price targets of $8/share, and $10/share, respectively.  The Merger consideration is also below the Company's 52-week trading high of $7.80/share.

CLASS ACTION COMPLAINT

88.    Furthermore, the consideration offered in the Proposed Transaction does not take into account the considerable synergies afforded to Open Text.  Notably, Mark Barrenechea, CEO of Parent, stated in his most recent Open Text comments to analysts and stockholders regarding Open text financial results during the most recent quarter, "[…] We recently announced our intention to acquire Guidance Software an information forensic company to strengthen our information platform and discovery offerings."  According to Parent's press release announcing the Merger, "The acquisition of Guidance is expected to complement the OpenText Discovery portfolio of software and services that provide search, extraction, classification, review and analysis of information, and to broaden OpenText Information Security capabilities through the addition of digital investigation, forensic security, and endpoint solutions."

89.    Obviously, the opportunity to invest in such Company in order to strengthen its market presence and portfolio of software and services is a great coup for Open Text, however it undercuts the foresight and investment of Plaintiff and all other public stockholders who have done the same.

90.    Moreover, post-closure, Guidance stockholders will be completely cashed out from any and all ownership interest in the Company, forever foreclosing them from receiving any future benefit in their investment as Guidance continues on its upward financial trajectory.

91.    It is clear from these statements and the facts set forth herein that this deal is designed to maximize benefits for Open Text at the expense of Guidance and Guidance's stockholders, which clearly indicates that Guidance stockholders were not an overriding concern in the formation of the Proposed Transaction.

***Preclusive Deal Mechanisms***

92.    The Merger Agreement contains certain provisions that unduly benefit Open Text by making an alternative transaction either prohibitively expensive or otherwise impossible. Significantly, the Merger Agreement contains a termination fee provision that requires Guidance to pay up to $ 6,014,095.55 to Open Text if the Merger Agreement is terminated under certain circumstances.  Moreover, under one circumstance, Guidance must pay this termination fee even if it enters into a definitive agreement with respect to a Superior Proposal (as defined in the Merger

CLASS ACTION COMPLAINT

Agreement) or, *within 12 months following the termination* of the Merger Agreement, the Company otherwise consummates a competing proposal. The termination fee will make the Company that much more expensive to acquire for potential purchasers. The termination fee in combination with other preclusive deal protection devices will all but ensure that no competing offer will be forthcoming.

93.     The Merger Agreement also contains a "No Solicitation" provision that restricts Guidance from considering alternative acquisition proposals by, *inter alia*, constraining Guidance's ability to solicit or communicate with potential acquirers or consider their proposals. Specifically, the provision prohibits the Company from directly or indirectly soliciting, initiating, proposing or inducing any alternative proposal, but permits the Board to consider a Takeover Proposal only if it constitutes or is reasonably calculated to lead to a "*Competing Proposal*" as defined in the Merger Agreement.

94.     Moreover, the Agreement further reduces the possibility of a topping offer from an unsolicited purchaser. Here, the Individual Defendants agreed to provide Open Text information in order to match any other offer, thus providing Open Text access to the unsolicited bidder's financial information and giving Open Text the ability to top the superior offer. Thus, a rival bidder is not likely to emerge with the cards stacked so much in favor of Open Text.

95.     Finally, in connection with the Offer and Merger, all members of the Board of Directors of the Company and certain officers of the Company have entered into a Tender and Voting Agreement (the "Tender Agreement") agreeing to, among other things, tender all the shares beneficially owned by them pursuant to the Offer and to vote against any Competing Proposal (as defined in the Merger Agreement) or any merger, consolidation or other combination involving the Company, other than the Merger, unless the Merger Agreement is terminated. As such, approximately 9% of all Guidance common stock currently issued and outstanding has been pledged in support of the Merger and the Offer thereby making consummation of the Proposed Transaction a *fait accompli*.

96.     Accordingly, the Company's true value is compromised by the consideration offered in the Proposed Transaction.

CLASS ACTION COMPLAINT

*Potential Conflicts of Interest*

97.    There is strong evidence that the Proposed Transaction may be tainted by the self-interest of the Individual Defendants. The Recommendation Statement contains material misrepresentations and omissions regarding employment negotiations taking place during the period in which the Proposed Transaction was being negotiated.

98.    The Recommendation Statement fails to disclose the timing of any indications  by Open Text that it intended to retain Guidance management.  The Recommendation Statement simply states that the "Board requested management . . . not discuss compensation arrangements with any potentially interested party until later in the sale process after such discussions had been consented to by the Company Board" and that "[m]anagement confirmed that they would comply" with the Board's request.

99.    Contrary to the disclosure in the Recommendation Statement, the continuing employment of Guidance management after the close of the Proposed Transaction appears to be a foregone conclusion.  In the press release announcing the Proposed Transaction, Defendant Dennis, Guidance's CEO and President, stated: "Joining with OpenText is a new beginning for Guidance products, customers and employees."

100.    Despite this public statement by Defendant Dennis, the Recommendation Statement actively misleads Guidance stockholders into believing that no discussions regarding continued employment of management took place.  While formal agreements on the issue may not have been reached, it is clear that some communication on the issue took place and the Recommendation Statement fails to disclose such communications.

101.    This information is particularly material with respect to Defendant Dennis as he was instrumentally involved in the negotiations with Open Text throughout the sale process.  For example, Open Text was not included on Morgan Stanley's list of potential bidders until Dennis recommended such.  This recommendation came after Defendant Dennis held a phone call with Open Text during which Open Text and Dennis determined it should be included as a potential bidder.  Similarly, nearly two months after the Board determined to cease considering the strategic transaction process and one month after Guidance terminated its relationship with Morgan Stanley,

CLASS ACTION COMPLAINT

Dennis held a phone call with Open Text and informed it of the status of the sale process and the Board's current considerations with respect to alternative transactions. Just one month after this conversation, Open Text submitted a non-binding preliminary indication of interest to acquire the Company. Any communications - even one-sided written indications in proposals or other written communications - concerning post-merger employment between Open Text or its affiliates and Defendant Dennis, or any other Guidance officers, directors, or employees, during the sales process, would be material to a stockholder's decision as to whether to tender their shares. Such communications give rise to substantial undisclosed conflicts of interests.

102.    Thus, the Recommendation Statement materially misleads Guidance stockholders by omitting material facts concerning the timing and nature of communications between Open Text and the Board or any Guidance senior management regarding post-transaction retention of Guidance's management and/or directors Guidance stockholders are currently led to believe that the sales process was free from such conflicts of interest, and that no negotiations regarding management retention occurred. The omitted information relating to the timing, content, and parties involved in these communications concerning the post-transaction retention of Guidance's management and/or directors would significantly alter the total mix of information that Defendants have disclosed to solicit stockholder support of the Proposed Transaction. The conflicts of interests created and fostered by such communications would affect the stockholders' perception and analysis of the entire process and the ultimate fairness of the Proposed Transaction. Thus the statements in the Recommendation Statement, relating to Guidance's senior management and/or director's post-transaction retention are rendered materially misleading by these omissions.

103.    In addition to the misleading representation's in the 14D-9 regarding post-transaction retention of Guidance's management and/or directors, the Recommendation Statement also details the self-interested motivations of the Individual Defendants in agreeing to this deal. Significantly, the members of the Board stand to receive massive financial benefits as a result of the Proposed Transaction due the immediate vesting of currently illiquid blocks of Company Restricted Shares that will be exchanged for cash.

104.    The table below sets forth information regarding the Vested Restricted Shares expected to be held by each of the Company's executive officers and directors as of August 4, 2017:

| Name | Number of Vested Restricted Shares (#) | Value of Vested Restricted Shares ($) |
|---|---|---|
| **Executive Officer** | | |
| Ken Basore | 190,557 | 1,352,955 |
| Barry Plaga | 375,950 | 2,669,245 |
| Alfredo Gomez | 124,357 | 882,934 |
| Patrick Dennis | 739,785 | 5,252,473 |
| Stephanie Urbach | 131,552 | 934,019 |
| Michael Harris | 199,452 | 1,416,109 |
| Rasmus van der Colff | 112,360 | 797,756 |
| **Director** | | |
| John Colbert | 22,933 | 162,824 |
| Michael McConnell | 22,933 | 162,824 |
| Wade Loo | 22,689 | 161,092 |
| Reynolds Bish | 22,689 | 161,092 |
| Max Carnecchia | 18,965 | 134,652 |
| Robert van Schoonenberg | 18,965 | 134,652 |

105.    Moreover, in the event that the Company's executive officers do not retain their employment following the close of the transaction, these directors/officers of the Company will receive a second financial windfall as a result of their 'golden parachute' packages in their employment agreement(s).  The table below describes the estimated potential payments to each of the Company's named executive officers under the terms of their respective Employment Arrangement and equity awards:

| Name | Cash ($)(1) | Equity ($)(2) | Perquisites/ Benefits ($)(3) | Total ($) |
|---|---|---|---|---|
| Patrick Dennis | 1,687,500 | 5,539,472 | 39,612 | 7,266,584 |
| Barry Plaga | 750,600 | 2,731,745 | 26,408 | 3,508,753 |
| Michael Harris | 420,500 | 1,472,359 | 18,098 | 1,910,957 |
| Ken Basore | 520,000 | 1,352,955 | 30,745 | 1,903,700 |
| Alfredo Gomez | 450,000 | 941,878 | 8,490 | 1,400,368 |

106.    Thus, while the Proposed Transaction is not in the best interests of Guidance's public stockholders, it will produce lucrative benefits for the Company's officers and directors.

***The Materially Misleading and/or Incomplete 14D-9***

107.    On August 8, 2017, Guidance filed with the SEC a materially misleading and incomplete 14D-9 that failed to provide the Company's stockholders with material information and/or provides them with materially misleading information critical to the total mix of

CLASS ACTION COMPLAINT

information available to the Company's stockholders concerning the financial and procedural fairness of the Proposed Transaction.

*Omissions and/or Material Misrepresentations Concerning Guidance's Financial Projections*

108.    The 14D-9 fails to provide material information concerning financial projections provided by Guidance's management, reviewed with Guidance's and relied upon by Morgan Stanley in its analyses.  Courts have uniformly stated that "projections … are probably among the most highly-prized disclosures by investors.  Investors can come up with their own estimates of discount rates or [] market multiples.  What they cannot hope to do is replicate management's inside view of the company's prospects."  *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 201-203 (Del. Ch. 2007).

109.    With respect to Morgan Stanley's *Discounted Equity Value Analysis*, the Recommendation Statement fails to disclose the projected net cash as of the end of the second quarter of calendar year 2019 and the 2019 EBITDA estimates used (note that the Recommendation Statement provides only "Adjusted EBITDA" projections).

*Omissions and/or Material Misrepresentations Concerning the Sales Process leading up to the Proposed Transaction*

110.    Specifically, the 14D-9 fails to provide material information concerning the process conducted by the Company and the events leading up to the Proposed Transaction.  In particular, the 14D-9 fails to disclose, omits and/or materially misrepresents the following:

(a)    The Recommendation Statement indicates that on January 20, 2017, Party D submitted a revised offer which contained a reduced price of "below $7 per share." Just five days later, on January 25, 2017, the Board determined that it would no longer conduct a review of strategic transactions as they had not received any acceptable offers and the "reduced  offer  price was  unacceptable," yet the Recommendation Statement fails to disclose what the value of Party D's revised offer was;

(b)    Despite the Board's determination to no longer review potential transactions, the Board entertained an indication of interest from Open Text for $6.79 (a price below $7 per share) on April 20, 2017, and subsequently opened negotiations with Open Text on

the proposal. The Recommendation Statement appears to be purposefully excluding the offer price from Party D, which was "below $7," because such offer may have been similar to, or higher than, the $6.79 Open Text offer. Were this to be the case, this omission would be particularly misleading as it allows the Company to not be placed in the uncomfortable position of explaining why the Board entertained and negotiated with Open Text upon receiving an offer of $6.79, which was also below $7, but did not act similarly with respect to Party D's proposal;

(c)     Similarly, the Recommendation Statement fails to disclose the level of interest expressed by other parties contacted during the strategic review process. For example, the Recommendation Statement indicates that as of December 2, 2016, "some of the potentially interested parties had indicated potential interest at lower prices than those provided by Party D and Party G," yet the Recommendation Statement fails to discuss what these prices were. This is particularly concerning as the offer prices being referred to at this time were $7 and $7.10. Thus, any indication of prices near or above $6.79, should have warranted further negotiations considering the Board's willingness to engage in negotiations with Open Text upon receiving the offer for $6.79.   The omission of this information renders the Recommendation Statement materially misleading as to the level of interest potential suitors showed in acquiring the Company;

(d)     The Recommendation Statement also fails to disclose the results of discussions with parties Morgan Stanley was instructed to contact regarding a potential sale. More specifically, the Recommendation Statement indicates that on November 2, 2016, the Board instructed Morgan Stanley to reach out to "four additional parties . . . that would be potentially interested in an acquisition of the Company." These four parties were to be in addition to the 30 parties Morgan Stanley had already contacted regarding a potential acquisition. However, there is no indication as to whether Morgan Stanley contacted all four of these additional parties.  In contrast, the only additional information on the matter in the Recommendation Statement simply states that "[a]s of November 22, 2016, Morgan Stanley had contacted 33 potentially interested parties." This statement would appear to indicate that at least one of the four additional parties was not contacted.  If this is the case, the Recommendation Statement should expressly disclose

CLASS ACTION COMPLAINT

Morgan Stanley's basis for disregarding the Board's express instruction to reach out to "four additional parties.";

(e)    The Recommendation Statement fails to disclose the events surrounding Morgan Stanley's decision to reach out to Open Text after the Board had expressly determined to no longer conduct the strategic review process.  Given the fact that Morgan Stanley was present when this decision was reached, the Recommendation Statement should clarify on what basis was Morgan Stanley authorized to make such a communication and/or whether Morgan Stanley was exceeding its authorization and disregarding the Board's decision to no longer engage in the strategic review process;

(f)    The Recommendation Statement discloses that Guidance entered into several confidentiality agreements with potential acquirers of certain segments of Guidance's operations during its search for strategic partners.  For example, the Recommendation Statement expressly states that "[f]rom September 2015 through January 2016 [the Company] . . . executed confidentiality agreements with eight parties without disclosing whether such confidentiality agreements contained standstill provisions that are currently hindering or prohibiting these parties from making topping bids

(g)    Similarly, the Recommendation Statement indicates that Party F entered into a confidentiality agreement but fails to disclose whether or not such confidentiality agreement contained a standstill provision that is currently hindering or prohibiting Party F from making a topping bid; and

(h)    The Recommendation Statement also indicates that on April 22, 2017, McCreight (the founder of Guidance) and his "affiliated entities agreed to comply with "customary standstill provisions."  However, the Recommendation Statement fails to disclose what "customary standstill provisions" entail, and whether such provisions bar McCreight from seeking to acquire the Company as a bidder, whether alone or in conjunction with others.

_Omissions and/or Material Misrepresentations Concerning the Financial Analyses Performed by Morgan Stanley_

CLASS ACTION COMPLAINT

111.    In the 14D-9, Morgan Stanley describe its fairness opinions and the various valuation analyses performed to render its opinion. However, the descriptions fail to include necessary underlying data, support for conclusions, or the existence of, or basis for, underlying assumptions. Without this information, one cannot replicate the analyses, confirm the valuations or evaluate the fairness opinions.

112.    For example, the 14D-9 does not disclose material details concerning the analyses performed by Morgan Stanley in connection with the Proposed Transaction, including (among other things):

a.    *Publicly Trading Analysis*: With respect to Morgan Stanley's Selected Public Trading Analysis, the 14D-9 fails to disclose the individual multiples and financial metrics for the companies observed by Morgan Stanley in its analysis;

b.    *Discounted Equity Value Analyses*: With respect to Morgan Stanley's Discounted Equity Value Analysis, the 14D-9 fails to disclose (i) the inputs and assumptions made in deriving the discount rate of 9.9%, and (ii) the Company's unlevered free cash flows for years 2022 through 2024 as well as the line items used to calculate those unlevered free cash flows;

c.    *Discounted Cash Flow Analysis*:    With respect to Morgan Stanley's Discounted Cash Flow Analysis, the 14D-9 fails to disclose (i) the inputs used and assumptions made in deriving the range of discount rate of 8.9% to 10.9%; and (ii) Morgan Stanley's basis for using low projected perpetual growth rates of 1.5% to 2.5%; and

d.    *Selected Precedent Transactions Analysis*: With respect to Morgan Stanley's Selected Precedent Transactions Analysis, the 14D-9 fails to disclose the individual multiples for each of the selected comparable transactions. The disclosure of such multiples is necessary because they are a crucial element of these analyses, as the analysis is based on comparison and relative valuation. Without such disclosure, stockholders are unable to determine whether the range of multiples selected by Morgan Stanley reflects appropriately comparable

CLASS ACTION COMPLAINT

transactions to the Proposed Transaction.  Failure to disclose this information renders the statements in the Recommendation Statement made by Morgan Stanley pertaining to the fairness of the Proposed Transaction misleading.

113. Without the omitted information identified above, Guidance's public stockholders are missing critical information necessary to evaluate whether the proposed consideration truly maximizes stockholder value and serves their interests.  Moreover, without the key financial information and related disclosures, Guidance's public stockholders cannot gauge the reliability of the fairness opinion and the Board's determination that the Proposed Transaction is in their best interests.

**FIRST COUNT**

**Claim for Breach of Fiduciary Duties**

**<u>(Against the Individual Defendants)</u>**

114. Plaintiff repeats all previous allegations as if set forth in full herein.

115. The Individual Defendants have violated their fiduciary duties of care, loyalty and good faith owed to Plaintiff and the Company's public stockholders.

116. By the acts, transactions and courses of conduct alleged herein, Defendants, individually and acting as a part of a common plan, are attempting to unfairly deprive Plaintiff and other members of the Class of the true value of their investment in Guidance.

117. As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty and good faith owed to the stockholders of Guidance by entering into the Proposed Transaction through a flawed and unfair process and failing to take steps to maximize the value of Guidance to its public stockholders.

118. Indeed, Defendants have accepted an offer to sell Guidance at a price that fails to reflect the true value of the Company, thus depriving stockholders of the reasonable, fair and adequate value of their shares.

119. Moreover, the Individual Defendants breached their duty of due care and candor by failing to disclose to Plaintiff and the Class all material information necessary for them to make an informed decision on whether to tender their shares in support of the Proposed Transaction.

CLASS ACTION COMPLAINT

120. The Individual Defendants dominate and control the business and corporate affairs of Guidance, and are in possession of private corporate information concerning Guidance's assets, business and future prospects. Thus, there exists an imbalance and disparity of knowledge and economic power between them and the public stockholders of Guidance which makes it inherently unfair for them to benefit their own interests to the exclusion of maximizing stockholder value.

121. By reason of the foregoing acts, practices and course of conduct, the Individual Defendants have failed to exercise due care and diligence in the exercise of their fiduciary obligations toward Plaintiff and the other members of the Class.

122. As a result of the actions of the Individual Defendants, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of Guidance's assets and have been and will be prevented from obtaining a fair price for their common stock.

123. Unless the Individual Defendants are enjoined by the Court, they will continue to breach their fiduciary duties owed to Plaintiff and the members of the Class, all to the irreparable harm of the Class.

124. Plaintiff and the members of the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which Defendants' actions threaten to inflict.

**SECOND COUNT**

**Violations of Section 14(e) of the Exchange Act**

**<u>(Against All Defendants)</u>**

125. Plaintiff repeats all previous allegations as if set forth in full herein.

126. Defendants have disseminated the 14D-9 with the intention of soliciting stockholders to tender their shares in favor of the Proposed Transaction.

127. Section 14(e) of the Exchange Act provides that in the solicitation of shares in a tender offer, "[i]t shall be unlawful for any person to make any untrue statement of a material fact

or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading[.]"

128.    The 14D-9 was prepared in violation of Section 14(e) because it is materially misleading in numerous respects and omits material facts, including those set forth above. Moreover, in the exercise of reasonable care, Defendants knew or should have known that the 14D-9 is materially misleading and omits material facts that are necessary to render them non-misleading.

129.    The Individual Defendants had actual knowledge or should have known of the misrepresentations and omissions of material facts set forth herein.

130.    The Individual Defendants were at least negligent in filing a 14D-9 that was materially misleading and/or omitted material facts necessary to make the 14D-9 not misleading.

131.    The misrepresentations and omissions in the 14D-9 are material to Plaintiff and the Class, and Plaintiff and the Class will be deprived of his entitlement to decide whether to tender his shares on the basis of complete information if such misrepresentations and omissions are not corrected prior to the expiration of the tender offer period regarding the Proposed Transaction.

### THIRD COUNT

### Violations of Section 20(a) of the Exchange Act

### (Against all Individual Defendants and Open Text Holdings, Inc.)

132.    Plaintiff repeats all previous allegations as if set forth in full herein.

133.    The Individual Defendants and Open Text were privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants and Open Text knew or should have known that the 14D-9 was materially misleading to Company stockholders.

134.    The Individual Defendants and Open Text were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein.  The Individual Defendants and Open Text were aware or should have been aware that materially false and misleading statements were being issued by the Company in the 14D-9 and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws.  The Individual Defendants and Open Text were able to, and did, control the contents of the 14D-9.  The Individual Defendants and Open Text were provided with copies of, reviewed and approved, and/or signed the 14D-9 before its issuance and had the ability or opportunity to prevent its issuance or to cause it to be corrected.

135.    The Individual Defendants and Open Text also were able to, and did, directly or indirectly, control the conduct of Guidance' business, the information contained in its filings with the SEC, and its public statements.  Because of their positions and access to material non-public information available to them but not the public, the Individual Defendants and Open Text knew or should have known that the misrepresentations specified herein had not been properly disclosed to and were being concealed from the Company's stockholders and that the 14D-9 was misleading.  As a result, the Individual Defendants and Open Text are responsible for the accuracy of the 14D-9 and are therefore responsible and liable for the misrepresentations contained herein.

136.    The Individual Defendants acted as controlling persons of Guidance within the meaning of Section 20(a) of the Exchange Act.  By reason of their position with the Company, the Individual Defendants had the power and authority to cause Guidance to engage in the wrongful conduct complained of herein.  The Individual Defendants controlled Guidance and all of its employees.  Additionally, Open Text also had direct supervisory control over the composition of the 14D-9 and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the 14D-9.  As alleged above, Guidance is a primary violator of Section 14 of the Exchange Act and SEC Rule 14d-9.  By reason of their conduct, the Individual Defendants are liable pursuant to section 20(a) of the Exchange Act.

**FOURTH COUNT**

**Violations of Section 14(d)(4) of the Exchange Act**

CLASS ACTION COMPLAINT

**(Against all Individual Defendants and Open Text Holdings, Inc.)**

137.    Plaintiff repeats all previous allegations as if set forth in full herein.

138.    Defendants have disseminated the 14D-9 with the intention of soliciting stockholders to tender their shares in favor of the Proposed Transaction.

139.    Section 14(d)(4) of the Exchange Act requires a full and complete disclosure in connection with the Tender Offer.

140.    The 14D-9 violates Section 14(d)(4) of the Exchange Act because it omits material facts, including those set forth above, which renders the Recommendation Statement false and/or misleading.

141.    Defendants knowingly or with deliberate recklessness omitted the material information identified above from the Recommendation Statement, causing certain statements therein to be materially incomplete and therefore misleading.  Indeed, while Defendants undoubtedly had access to and/or reviewed the omitted information in connection with approving the Proposed Transaction, they allowed it to be omitted from the 14D-9, rendering certain portions of the Recommendation Statement incomplete and misleading.

142.    The misrepresentations and omissions in the Recommendation Statement are material to Plaintiff, and Plaintiff and the Class will be deprived of their entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the expiration of the Tender Offer.

143.    WHEREFORE, Plaintiff demands injunctive relief, in his favor and in favor of the Class, and against the Defendants, as follows:

A.    Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representatives and Plaintiff's counsel as Class counsel;

B.    Enjoining the Proposed Transaction;

C.    In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

D.    Declaring and decreeing that the Merger Agreement was agreed to in breach of the fiduciary duties of the Individual Defendants and is therefore unlawful and unenforceable;

CLASS ACTION COMPLAINT

E.      Directing the Individual Defendants to exercise their fiduciary duties to commence a sale process that is reasonably designed to secure the best possible consideration for Guidance and obtain a transaction which is in the best interests of Guidance and its stockholders;

F.      Directing defendants to account to Plaintiff and the Class for damages sustained because of the wrongs complained of herein;

G.      Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

H.      Granting such other and further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury on all issues which can be heard by a jury.

Dated: August 21, 2017              **BRODSKY & SMITH, LLC**

By: *_/s/ Evan J. Smith_*
Evan J. Smith (SBN242352)
9595 Wilshire Boulevard, Suite 900
Beverly Hills, CA 90212
Telephone:      (877) 534-2590
Facsimile:      (310) 247-0160

*Attorneys for Plaintiff*

CLASS ACTION COMPLAINT